UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

RONALD SCOTT EDDINGTON,

Petitioner,

vs.

JOSH TEWALT, IDOC Director,

Respondent.

Case No. 1:19-cv-00291-REB

**MEMORANDUM DECISION AND ORDER**

Petitioner Ronald Scott Eddington ("Petitioner," "Eddington," or "Ron") filed a Petition for Writ of Habeas Corpus challenging his state court conviction. (Dkt. 1.) Respondent Josh Tewalt ("Respondent") has filed a Response. The Petition is now fully briefed and ripe for adjudication. (Dkts. 1, 12, 14, 17.) All named parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. (Dkt. 6.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

The Court takes judicial notice of the records from Petitioner's state court proceedings, which have been lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006). Having carefully reviewed the record, including the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that oral argument is

**MEMORANDUM DECISION AND ORDER - 1**

unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

## BACKGROUND

The Idaho Court of Appeals set forth the facts supporting Petitioner's Idaho state court convictions of second degree kidnaping and aggravated assault with a deadly weapon against victim Carrie Eddington, his ex-wife ("Carrie"), as follows:

> On August 9, 2013, Eddington broke into his ex-wife's home, held her at gunpoint, and threatened to kill both himself and his ex-wife. Once Eddington left the house, the ex-wife called her father, who then called the police. The State charged Eddington with second degree kidnapping pursuant to Idaho Code § 18-4503, burglary pursuant to I.C. § 18-1401, aggravated assault pursuant to I.C. § 18-905(a), and using a deadly weapon in the commission of a felony pursuant to I.C. § 19-2520. Eddington retained private counsel. Soon after Eddington was charged, his mother was charged with witness intimidation, I.C. § 18-2604. The charge stemmed from a letter Eddington's mother wrote to her ex-daughter-in-law about Eddington's charges.[1] Eddington's trial counsel then agreed to represent Eddington's mother.

> Eddington pled guilty to second degree kidnapping and aggravated assault, and the remaining charges were dismissed as the result of a plea agreement. Eddington was sentenced on March 17, 2014. During the sentencing hearing, the State put several witnesses on the stand. The witnesses most relevant to the post-conviction proceedings were Eddington's ex-wife,

---

[1] The letter from Petitioner's mother to the victim, in part, stated: "We know the decision about [the Petitioner's] future is in your hand, Carrie. We know you will do what is best for you and the children. This frightening event will be put to rest in your mind in time but the children have to live the humiliation of having their father in prison for the rest of their lives. How do they explain that to people? How does [your 12-year-old son R.E.] tell his buddies where the father he adores is living? Our greatest wish would be that the charges would be dropped and he could get the psychological help he needs...." (Footnote not in original; *see* letter at State's Lodging E-1, p. 251.)

**MEMORANDUM DECISION AND ORDER - 2**

> the ex-wife's father, the detective who responded to the scene
> of the crime, and a forensic psychologist. The district court
> then imposed a unified sentence of twenty-two years, with ten
> years determinate, for second degree kidnapping and a
> concurrent unified sentence of five years, with five years
> determinate, for aggravated assault. On March 18, 2014,
> Eddington's mother's charge was dismissed.

(State's Lodging D-5, pp. 1-2.)

Petitioner's judgment of conviction was entered on March 13, 2014. (State's Lodging A-2, pp. 107-08.) Petitioner filed a direct appeal, but voluntarily dismissed it. (State's Lodging B-2.) He next filed a post-conviction action through counsel, which was summarily dismissed. (State's Lodgings C-1 to C-2.) The Idaho Court of Appeals remanded four of Petitioner's ineffective assistance of trial counsel claims for an evidentiary hearing. (State's Lodging D-5.) After a hearing was held by Judge Lynn Norton (the same judge who presided over Petitioner's original criminal case), Petitioner's claims were denied and dismissed. (State's Lodgings E-1 to E-3.) Dismissal was affirmed on appeal, and the Idaho Supreme Court denied Petitioner's petition for review. (State's Lodgings F-1 to F-8.) Petitioner now seeks federal habeas corpus relief.

## PETITIONER'S CLAIMS

In the Petition for Writ of Habeas Corpus, Petitioner brings four Sixth Amendment ineffective assistance of trial counsel claims: first, that trial counsel had an actual conflict of interest when he represented both Petitioner and his mother simultaneously on related criminal charges; second, that trial counsel pressured Petitioner into pleading guilty

**MEMORANDUM DECISION AND ORDER - 3**

because of the conflict of interest; third, that trial counsel failed to investigate the discovery he obtained in the case, namely, he failed to listen to the audio recordings of police interviews of Petitioner's ex-wife; and fourth, because of the conflict of interest, counsel failed to prepare adequately for sentencing, namely, he failed to cross-examine his ex-wife with a police interview transcript, emails, and other evidence that tended to controvert her victim statement about Petitioner's alleged violent and harassing behavior in their past relationship.

## STANDARDS OF LAW

### 1.   *AEDPA Deferential Review Standard*

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A challenge to a state court judgment that addressed the merits of any federal claims is governed by Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA").

The AEDPA limits relief to instances where the state court's adjudication of the petitioner's claim:

> 1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

**MEMORANDUM DECISION AND ORDER - 4**

28 U.S.C. § 2254(d). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

As to the facts, the United States Supreme Court has clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011); 28 U.S.C. §2254(e)(2). This means that evidence not presented to the state court may not be introduced on federal habeas review if a claim (1) was adjudicated on the merits in state court and (2) the underlying factual determination of the state court is not unreasonable. *See Murray v. Schriro*, 745 F.3d 984, 999 (9th Cir. 2014). In such case, a "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner must show, by clear and convincing evidence, that the factual findings are not just erroneous, but unreasonable, in light of the evidence presented to the state courts. 28 U.S.C. § 2254(e)(1); § 2254(d)(2).

In *Pizzuto v. Yordy*, the Ninth Circuit reiterated the high standard for such a showing:

> Under § 2254(d)(2), we may not characterize a state court's factual determinations as unreasonable "merely because [we] would have reached a different conclusion in the first instance." *Brumfield*, 135 S. Ct. at 2277 (alteration in original) (quoting *Wood v. Allen*, 558 U.S. 290, 301, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010)). "Instead, § 2254(d)(2) requires that we accord the state trial court substantial

**MEMORANDUM DECISION AND ORDER - 5**

deference." *Id*. "If '[r]easonable minds reviewing the record
might disagree about the finding in question, on habeas
review that does not suffice to supersede the trial court's ...
determination.'" *Id*. (alterations in original) (quoting *Wood*,
558 U.S. at 301, 130 S.Ct. 841).

947 F.3d 510, 530 (9th Cir. 2019).

Where a petitioner contests the state court's legal conclusions, including

application of the law to the facts, § 2254(d)(1) governs. That section consists of two

alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established

federal law "if the state court applies a rule different from the governing law set forth in

[the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court]

[has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694

(2002).

Under the second test, to satisfy the "unreasonable application" clause of

§ 2254(d)(1) the petitioner must show that the state court—although it identified "the

correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably

applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*,

529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which

a state court unreasonably *applies* [Supreme Court] precedent; it does not require state

courts to extend that precedent or license federal courts to treat the failure to do so as

error." *White v. Woodall*, 572 U.S 415, 426 (2014).

**MEMORANDUM DECISION AND ORDER - 6**

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

Like the deference due to state court findings of fact, a federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's legal conclusions are incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. at 694. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter* ("*Richter*"), 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (internal citation omitted).

### 2.  *De Novo Review Standard*

In some instances AEDPA deferential review under § 2254(d)(1) does not apply: (1) if the state appellate court did not decide a properly-asserted federal claim, (2) if the

**MEMORANDUM DECISION AND ORDER - 7**

state court's factual findings are unreasonable under § 2254(d)(2), or (3) if an adequate

excuse for the procedural default of a claim exists. In such instances, the federal district

court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

As in the pre-AEDPA era, a district court reviewing a claim de novo can draw from both

United States Supreme Court and circuit precedent, limited only by the non-retroactivity

rule of *Teague v. Lane*, 489 U.S. 288 (1989).

Under de novo review, if the factual findings of the state court are not

unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. §

2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167. Contrarily, if a

state court factual determination is unreasonable, or if there are no state court factual

findings, the federal court is not limited by § 2254(e)(1). In such a case, the federal

district court may consider evidence outside the state court record, except to the extent

that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

### 3. *Ineffective Assistance of Counsel Standard of Law*

The clearly-established law governing a Sixth Amendment claim of ineffective

assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984).

*Strickland* dictates that, to succeed on an ineffective assistance claim, a petitioner must

show that (1) counsel's performance was deficient in that it fell below an objective

standard of reasonableness, and that (2) the petitioner was prejudiced by the deficient

performance. *Id*. at 684.

**MEMORANDUM DECISION AND ORDER - 8**

In assessing trial counsel's performance under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

In assessing prejudice under *Strickland*'s second prong, a court must find that, under the particular circumstances of the case, there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

A petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel claim. 466 U.S. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id.*

The foregoing standard, giving deference to counsel's decisionmaking, is the de novo standard of review. Another layer of deference—to the state court decision—is afforded under AEDPA. In giving guidance to district courts reviewing *Strickland* claims on habeas corpus review, the United States Supreme Court explained:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the

**MEMORANDUM DECISION AND ORDER - 9**

inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Williams*, *supra*, at 410, 120 S.Ct. 1495. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Richter*, 562 U.S. at 112.

## FACTS FROM EVIDENTIARY HEARING
## RELEVANT TO ALL CLAIMS

Upon remand of four ineffective assistance of counsel claims challenging trial counsel Michael Bartlett's performance, the state district court held an evidentiary hearing. (State's Lodgings E-1 to E-2.) The following evidence was presented, and the state district court engaged in the following factfinding.

The Petitioner confessed to police officers shortly after the crime occurred. The confession greatly limited counsel's ability to defend Petitioner at trial. (State's Lodging E-1, p. 259.) Bartlett recalled that Petitioner had "told police that he would accept what [the victim] said as being accurate, as he didn't have a complete recollection of the event." (State's Lodging E-3, p. 21.)

Petitioner originally pleaded not guilty to the four criminal charges, but later entered into a plea agreement in which the State agreed to dismiss two of the charges if he pleaded guilty to the remaining two. At the change of plea hearing, Petitioner

**MEMORANDUM DECISION AND ORDER - 10**

acknowledged that he had initialed each section of the guilty plea advisory form and that he had signed and completed it correctly and truthfully. (State's Lodging A-3, p. 13.) As the factual basis for the plea, he admitted that he went into Carrie's house in the "in the middle of the night and confined her into her bedroom." (*Id*., p. 17.) He admitted that he had the intent to keep her there against her will, that he threatened to shoot her with a gun, which is a "deadly weapon," and that his threats created in her a well-founded fear in that violence was imminent. (*Id*., pp. 18-19.)

In contrast, at the post-conviction hearing, while Petitioner admitted that he signed the guilty plea advisory form, he added, "I was threatened, though." He testified that he "essentially" lied on the form. After much waffling, he agreed that signing the form without disclosing the alleged threats was the equivalent of lying to the sentencing judge about not having been threatened to enter the plea agreement. (*Id.*, pp. 165-67.)

In support of his coerced plea claim, Petitioner testified at the post-conviction evidentiary hearing that Mr. Bartlett became upset when Petitioner said he did not want to plead guilty. Mr. Bartlett started yelling at him and told him, "Just sign the damn thing." (*Id*., p. 117.) Petitioner said, "I didn't do these things." (*Id*.) Mr. Bartlett responded, "Then call your parents and tell them you need another $20,000 for your defense." (*Id*.) Then Mr. Bartlett said, "Look, your mom's case is going to be dismissed the day after you plead out tomorrow. You need to just sign the paper so we can move forward with all this." (*Id*., p. 118.) Later in their conversation, Petitioner said, "I'll sign

your paper, but I'm going to stand up in the hearing and say I'm not guilty of these things." And Mr. Bartlett allegedly got "really mad" again, "stood up and pointed his finger at [Petitioner,] and said, 'You're going to say exactly what I tell you to say at that hearing, and you're not going to change anything or things won't go forward like they should.'" (*Id*., p. 120.)

The state district court found that, at the time of Petitioner's representation, Bartlett had been working with the law firm of Nevin, Benjamin, McKay & Bartlett for about 20 years, and 99.9% of his work was criminal. Bartlett also taught criminal law continuing education seminars. (State's Lodging E-1, pp. 251-52.) In assessing the case, Bartlett knew Petitioner confessed to police. Bartlett didn't think the confession was challengeable.

While Petitioner suggested that they use a "whacked out on Ambien" defense, Bartlett didn't think that would be "an effective strategy at all," citing all of the detailed tasks Petitioner completed that evening with no difficulty—leaving his own house without waking his current wife, driving to his ex-wife's house, gaining entry to his ex-wife's house, loading his weapon, and then doing most of those tasks all over again in the reverse order, ending with him getting back in bed with his wife as if he had never left. (*Id.*, pp. 201-02; 259-60.) Bartlett concluded there was a possibility of conviction on each of the four counts, with the kidnapping count being the weakest. (*Id*., p. 205.)

**MEMORANDUM DECISION AND ORDER - 12**

Responding to Petitioner's allegations that Bartlett used coercive tactics to make

Petitioner plead guilty, Bartlett testified as follows.

Q.     And were there any problems communicating
       with Mr. Eddington that day?

A.     I don't recall any communication problems with
       Ron that day, no.

Q.     Did Ron ever tell you he was absolutely not
       going to plead guilty?

A.     No.

Q.     Did you blow up at Ron and shake your fingers
       at him and tell him he was pleading guilty?

A.     Of course not.

Q.     Did Ron ever say, "Mr. Bartlett, I'll sign your
       paper, but I'm going to tell the judge I'm not
       guilty?"

A.     No, of course not. If Ron had told me he didn't
       want to go forward or that he would say
       something different in open court, then I would
       have had a meaningful, thoughtful conversation
       with him about what he wanted to do instead,
       and we would have taken that course of action.
       That would have been a foolish thing to do.

Q.     Did you ever point your finger at Mr. Eddington
       and say, "You're going to say exactly what I tell
       you to say"?

A.     Of course not. That's ridiculous.

Q.     Did you ever tell him, "You're going to say
       what I tell you to say" and ever allude to his
       mother's case?

A.     No, of course not.

Q.     Did you need Mr. Eddington's plea to dismiss
       Diana Eddington's case?

**MEMORANDUM DECISION AND ORDER - 13**

> A. Diana Eddington's case, as I indicated earlier, was incredibly weak. I didn't believe it would ever get past preliminary hearing. I never for a moment thought that they were connected in any way, shape, or form.

(State's Lodging E-2, pp. 221-22.)

Bartlett went on to testify that he takes great pride in caring for his clients, that he cared about Ron, and that if Ron had wanted to do something different, Bartlett would have talked it through with him until they reached a conclusion about what they needed to do. Bartlett clarified that there is a difference between a client saying, "I don't want to plead guilty," and one saying, "I won't plead guilty," because *no one* wants to plead guilty to a crime, but he believed Petitioner made the conscious choice, knowingly, intelligently, and voluntarily to enter a plea. (*Id.*, pp. 222-23.) "And, if any one of those things hadn't been present in my mind, I wouldn't have wanted to go forward and I wouldn't have gone forward with the plea colloquy the next day," testified Bartlett. (*Id.*, p. 224.)

As to the conflict of interest between Petitioner and his mother, Diana, Petitioner alleged in post-conviction proceedings that Bartlett would have used Diana's letter in support of Petitioner or called her as a witness at sentencing but for Bartlett's conflict in trying to protect Diana's case. Testifying on behalf of Petitioner at the post-conviction hearing, Diana said that Bartlett told her the letter could negatively influence her own case, so he wasn't going to submit it in Petitioner's sentencing proceedings. (State's Lodging E-2, pp. 42-43.)

**MEMORANDUM DECISION AND ORDER - 14**

As to other aspects of the conflict claim, Diana admitted that, when Petitioner phoned her from the jail, they never talked about Petitioner pleading guilty to aid in getting her case dismissed. (*Id*., p. 49.) Diana admitted signing an affidavit that said: "Mr. Bartlett repeatedly informed me that the charges against me were unfounded, and he would get them dismissed." (*Id*., p. 76.)

In the "Order Dismissing after Evidentiary Hearing (on remand)," the state district court found:

> Petitioner's testimony about Bartlett's anger, threats and yelling on January 14, 2014 is simply not credible given the extensive conversations recorded between Petitioner and Bartlett and Bartlett's extensive explanation about the importance of Petitioner making his own decision whether to enter a guilty plea. The guilty plea hearing and guilty plea form also show by a preponderance of the evidence that there was no covert plea agreement linking dismissal of Diana's case with Ron's guilty plea. While the Petitioner testified at the evidentiary hearing that he was lying at the plea hearing and that his testimony at the evidentiary hearing was more credible, the Court finds by a review of all of the evidence that the Petitioner's testimony at the guilty plea hearing was the truth as supported by the record and that Petitioner's testimony at the evidentiary hearing was not credible.

(State's Lodging E-1, p. 263.)

As to the non-submission of Diana's letter at Petitioner's sentencing hearing, the court found:

> Bartlett addressed Petitioner's [mother's letter], saying that it was absolutely intentional that he did not submit [it] to the Court. Bartlett testified that his representation of Diana did not limit his ability to represent Ron. He testified that

Diana's letter was inappropriate for submission as originally written because it talked about the effect of the case on the children without recognizing the Court could attribute the poor effects of the children to Ron's behavior. It also contained a phrase about Carrie charging Diana with a felony and having a no contact order as blaming the victim or showing that the whole situation was made worse by Carrie. Bartlett testified he always asked anyone writing a letter of support to leave out any statement that seemed to blame the victim. Bartlett said that, in his experience, when someone close to a defendant blames the victim, the judge thinks that attitude mirrors [his] client's thoughts and is ultimately unhelpful. So, he prefers letters of support that focus on good qualities. He testified having Diana testify at Petitioner's sentencing hearing was never a consideration in Bartlett's mind because he felt that it was a "particularly poor strategic decision" to let a parent, especially a mother, take the stand because a parent could very easily get walked into providing information that would be harmful to Ron. Bartlett testified that mothers don't accept responsibility for their children's crimes and that judges expect parents to love their children and want positive outcomes. Bartlett testified that, in his experience parents testifying at sentencing provided a big danger with limited benefit.

(State's Lodging E-1, pp. 263-64.)

After the evidentiary hearing, the state district court rejected all four of

Petitioner's ineffective assistance of trial counsel claims. (State's Lodging E-1, pp. 251-

272.) The court found that Petitioner never expressed that he felt he had to enter a guilty

plea to obtain dismissal of his mother's case; Diana acknowledged that Petitioner never

told her that he felt he had to enter a guilty plea to get her case dismissed; and Diana

never told him that his guilty plea would bring about dismissal of her charge. The court

also found that Bartlett consistently advised Diana that her criminal charges would soon

**MEMORANDUM DECISION AND ORDER - 16**

be dismissed because there was no evidence that her email was intended to hurt the victim—not because her charges were dependent upon Petitioner's plea agreement. The trial court also found that there was never any discussion among Bartlett and the two prosecutors about a resolution in Petitioner's case being tied to his mother's case. (*Id.*, pp. 252-56; 268-71.)

## CLAIM 1: CONFLICT OF INTEREST

Claim 1 is that Bartlett had a conflict of interest when he agreed to represent Petitioner and Petitioner's mother, Diana, at the same time. This claim was decided on the merits by the Idaho Court of Appeals and by denial of the petition for review by the Idaho Supreme Court; therefore, the Idaho Court of Appeals' decision is entitled to AEDPA deference. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("[A] federal court should 'look through' [an] unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.").

Petitioner contends that there was a secret, off-the-record, plea agreement or mutual understanding that his mother's charge in the separate case would be dismissed only if he accepted the state's plea offer. (See State's Lodging F-5, p.4; Dkt. 14, pp.8-16.) This is why, Petitioner asserts, his mother's preliminary hearing at which the charge against her was dismissed was re-scheduled to a date *after* Petitioner's case was resolved.

(Dkt. 14, pp.8-16.) In order to "protect" the dismissal of his mother's charge, Petitioner asserts, trial counsel coerced him into accepting the state's plea offer. (*Id*.)

For the reasons that follow, this claim will be denied.

### 1. Conflict of Interest Standard of Law

A criminal defendant has the right to be represented by conflict-free counsel under the Sixth Amendment. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). A "possible conflict of interest" is created "that could prejudice either or both clients" when the same counsel represents two defendants in criminal actions arising from the same set of facts. *Burger v. Kemp*, 483 U.S. 776 (U.S. 1987). However, it is settled that "[r]equiring or permitting a single attorney to represent codefendants, often referred to as joint representation, is not per se violative of constitutional guarantees of effective assistance of counsel." *Id*. at 783 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978)). To the contrary, "[i]n many cases, a common defense gives strength against a common attack." *Id*. (internal citations and quotation marks omitted).

The United States Supreme Court has made it clear that the mere "possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan* ("*Sullivan*"), 446 U.S. 335, 350 (1980). When a conflict is shown, prejudice is presumed only when (1) "the defendant demonstrates that counsel actively represented conflicting interests"; and (2) "an actual conflict of interest adversely affected his lawyer's performance." *Burger*, 483 U.S. at 73 (quoting *Strickland*, 466 U.S. at 692), and citing *Sullivan*, 446 U.S. at 348.

*See also Mickens v. Taylor*, 535 U.S. 162, 172-73 (2002) (rejecting the proposed rule of automatic reversal of a conviction where there existed a conflict that did not affect counsel's performance).

Therefore, a defendant who brings an attorney conflict of interest claim must "show that potential conflicts impermissibly imperil[ed] his right to a fair trial." *Sullivan*, 446 U.S. at 348 (internal citations omitted). The *Sullivan* Court provided the following example of a conflict of interest that adversely affected the defendant's trial:

> In *Glasser v. United States*, [315 U.S. 60 (1942)], for example, the record showed that defense counsel failed to cross-examine a prosecution witness whose testimony linked Glasser with the crime and failed to resist the presentation of arguably inadmissible evidence. *Id*., at 72-75, 62 S.Ct. at 465-467. The Court found that both omissions resulted from counsel's desire to diminish the jury's perception of a codefendant's guilt. Indeed, the evidence of counsel's "struggle to serve two masters [could not] seriously be doubted." *Id*., at 75, 62 S.Ct., at 467. Since this actual conflict of interest impaired Glasser's defense, the Court reversed his conviction.

446 U.S. at 348-49.

### 2. Idaho Appellate Court Decision

The Idaho Court of Appeals reviewed the conflict of interest claim as a federal constitutional issue, citing to state law cases relying on *Sullivan*:

> In support of Eddington's argument that trial counsel's joint representation created an actual conflict, Eddington points to numerous, diffuse facts including that his parents were paying for his defense; trial counsel expressed concern that the State might claim Eddington had aided and abetted

**MEMORANDUM DECISION AND ORDER - 19**

his mother's witness intimidation; his presentence investigation report detailed his mother's conduct giving rise to her charge; the prosecutors communicated about the status of Eddington's case and his mother's case; his mother attended his sentencing hearing despite the existence of a "no contact order" prohibiting her from being near his ex-wife, who also attended the hearing; and his mother's charge was only dismissed after he pled guilty. Eddington argues the inferences from these facts clearly establish that his and his mother's cases were "linked," making his guilty plea a condition of the dismissal of his mother's charge and adversely impacting his representation.

We disagree. The district court correctly concluded that Eddington had failed to show an actual conflict of interest by a preponderance of the evidence. Among other things, the district court correctly found that there were never any discussions between the prosecutors and trial counsel about Eddington's case being linked to his mother's case; there were never any plea offers made linking the two cases together; there were no discussions between Eddington and his mother to support his claim that their cases were "linked"; and Eddington never stated during sentencing that he was pleading guilty so the prosecution would dismiss his mother's case. Further, there is no evidence trial counsel was biased in favor of Eddington's mother, despite her payment of Eddington's legal fees.

Eddington's argument on appeal places significant focus on the fact that his mother's dismissal occurred after his guilty plea. In particular, he challenges as inaccurate the district court's finding that "it was [trial counsel] who requested [Eddington's mother's charge] be dismissed after [Eddington's] sentencing so that the No Contact Order between the [ex-wife] and [the mother] remained in place to avoid [the mother] from further upsetting the [ex-wife] before [Eddington's] sentencing." Eddington disputes this finding and argues "the State, not [trial counsel], strategically scheduled [the mother's] dismissal."

**MEMORANDUM DECISION AND ORDER - 20**

While Eddington is technically correct that it appears the State—not trial counsel—proposed the rescheduling of the dismissal, this fact does not undermine the district court's ultimate conclusion that there was no actual conflict of interest. Trial counsel testified the no-contact order protected Eddington's mother against his ex-wife making further accusations of intimidation, which protection was important because of the case's emotional nature. As this testimony shows, trial counsel's decision not to challenge the State's rescheduling of the dismissal was not the result of an actual conflict but, rather, of trial counsel's reasonable strategy.

The circumstantial facts Eddington identifies on appeal are inadequate to conclude the district court's findings are clearly erroneous. Based on these findings, the district court correctly ruled there was no actual conflict of interest. Accordingly, the district court did not err in concluding trial counsel was not ineffective because he jointly represented Eddington and his mother.

(State's Lodging F-5, pp. 4-5.)

### 3. Analysis

The Court first addresses the state district court's incorrect finding of fact that the Idaho Court of Appeals acknowledged and corrected its opinion, cited directly above. On direct examination, Bartlett recalled that *he* had asked the prosecution to schedule Diana's preliminary hearing (where he expected the State to dismiss the charge) after Petitioner's change-of-plea hearing, for the reason that Diana's no-contact order would still be in place when she and the victim were both in the courtroom for Petitioner's sentencing. On cross-examination, counsel presented Bartlett with Exhibit N, an email that shows the prosecutors, *not* Bartlett, had set Diana's preliminary hearing on the day

after Petitioner's guilty plea. (State's Lodging E-2, pp. 254-55.) The state district court mistakenly found that Bartlett had chosen the hearing date, when prosecutors actually had. However, the Idaho Court of Appeals corrected that error on review and noted that the error did *not* affect the outcome of the claim. Petitioner asserts that the Idaho Court of Appeals made an unreasonable determination of fact when it found that Bartlett's choice *not to challenge* the prosecution's rescheduling of Diana's preliminary hearing was based on "reasonable strategy."

On federal habeas review, the findings of fact of the state appellate court (and any state district court findings of fact not in conflict with state appellate court findings of fact) are entitled to AEDPA deference. *See James v. Ryan,* 733 F.3d 911, 916 (9th Cir. 2013) (noting that *Johnson* "does not require us to ignore a state court's explicit explanation of its own decision"); *Ylst*, 501 U.S. at 804 (holding that the court looks "to the last reasoned decision" resolving a claim). Therefore, here, this Court presumes that the finding of fact that the appellate court made—that Bartlett did not select the date of Petitioner's mother's preliminary hearing—is correct. This Court disregards the state district court's contrary finding.

Petitioner argues that the fact that Bartlett did not choose the hearing date definitively shows that he really had no strategy to have Diana's case dismissed after Petitioner's to keep the no-contact order in place as a protection against any trouble that might arise between Diana and the victim at sentencing. However, the Idaho Court of

**MEMORANDUM DECISION AND ORDER - 22**

Appeals focused not on whether Bartlett *requested* the hearing on that date based on strategy, but on whether Bartlett, after received notice of the hearing, *chose not to oppose the rescheduling* to that date *based on strategy*. In other words, while Bartlett's memory of who requested the date of the hearing was imperfect, his memory of his reason for agreeing with that date remained intact and was based in strategy. This is a finding of fact by the Idaho Court of Appeals that is entitled to deference, meaning that Petitioner bears the burden of showing that fairminded jurists could not disagree on this point. Petitioner must show that this factfinding about a strategic reason behind Bartlett's non-opposition to Diana's hearing date was not merely erroneous, but also unreasonable.

The Court concludes that Petitioner has not met this burden. The Idaho Court of Appeals' factfinding is supported by the overall record. There is little in Bartlett's testimony to show that he had any motive to lie about this point (or about any other). Human minds are not infallible when trying to recall what happened four years earlier in a certain case on a certain day. Elsewhere in his post-conviction testimony, Bartlett was quick to admit in the hearing when he felt he *had* been wrong—such as his failure to use evidence at sentencing that showed a lack of violence and harassing contact between Petitioner and his ex-wife prior to the crime. That willingness to admit wrongdoing in one area bolstered his credibility overall.

Bartlett's overall testimony about Diana's representation was credible. He testified that he had little desire to press for a quicker preliminary hearing for Petitioner's mother

**MEMORANDUM DECISION AND ORDER - 23**

to see whether she would be bound over for trial, because the prosecutors said they would dismiss the case. "Why would I take any risk at all if they said they were going to dismiss it?" he testified. (State's Lodging A-3, p- 253-54.) He also stated: "I had already had discussions, and they said they were going to dismiss it. And I haven't had a prosecutor tell me they were going to dismiss a case and then not do that in my career." (*Id*., p. 253.)

To bolster his argument, Petitioner points to another topic at the change of plea hearing to attempt to show that his case and Diana's case were interdependent. At the plea hearing, the Court wanted to know specifically which charges were included in the plea agreement. The prosecutor said she was not aware of any new acts for which Petitioner might be charged, but that she had not had opportunity to review Petitioner's telephone call transcripts from the jail for about six weeks. The prosecutor said she would like to reserve the right to bring new charges arising from any of those unreviewed calls and did not want that time period included in the claims the State was giving up in the plea agreement. In response Bartlett stated: "Specifically, Your Honor, the state has charged his mother with the crime of intimidating a witness, and I'm concerned that they'll claim that he's aiding and abetting that crime." (State's Lodging A-3, pp. 6-8.) The Court then asked the prosecutor and Bartlett to meet during a recess to determine what, exactly, their agreement was. (*Id*., p. 7.)

After the recess, the agreement the prosecutor articulated for the court was: "anything from today forward would constitute a new crime, but anything that's

**MEMORANDUM DECISION AND ORDER - 24**

happened prior to today's date, would just be fodder for argument at sentencing." (*Id.*, p. 8.)

Petitioner argues that Bartlett's "statement of concern to the court at the plea hearing about Petitioner's exposure to Diana's charge renders false Bartlett's statement at the evidentiary hearing that he "did not believe [Diana's case] would, in any way, impact [his] case." But Petitioner is mixing apples and oranges with this assertion. The "new acts" issue is about whether Petitioner *could be charged* with a *new* crime that would specifically be excluded from his current case—which is a completely different issue from whether Petitioner was *required to plead* guilty to the *existing* criminal charges to effectuate the prosecutor's alleged promise to dismiss Diana's case.

Also weighing against Petitioner's theory that the cases were interdependent is the reality that Idaho law permitted the State to charge Petitioner with aiding and abetting his mother's intimidation of a witness regardless of whether she had been charged at all or whether her case had been dismissed. *See* I.C. § 19-1430 (abolishing the distinction between principals and aiders and abettors). Thus, the prosecutors had no need to leave Diana's case open in order to charge Petitioner with aiding and abetting her if his recent jail phone calls supported such charges.

Most recently, Petitioner filed a Motion for Leave to Present New Evidence (Dkt. 19) to support his argument that his counsel's conflict of interest is made clear based on "new evidence" that the prosecutor in his case—Whitney Faulkner—was intimately

involved in prosecuting Petitioner's mother's case, at the side of prosecutor Dan Dinger, even though she denied that to the trial court. Respondent is correct that this evidence, in the form of the written transcript, is already before the Court. Petitioner desires to submit the audio version of the hearing, even though it was not considered by the state appellate courts. The Court will deny the Motion as moot.

As the Court of Appeals found, "there were never any discussions between the prosecutors and trial counsel about Eddington's case being linked to his mother's case," nor were there "any plea offers made linking the two cases together." Even assuming that Ms. Faulker did work on both Petitioner's case and Petitioner's mother's case, the Court sees nothing in the record showing that disposition of Diana's case was dependent upon disposition of Petitioner's case, or that Petitioner's counsel was involved in some sort of illicit agreement with the prosecutors to that effect.

After a review of the entire record, this Court fully agrees with the Idaho Court of Appeals' decision that Petitioner failed to show an actual conflict of interest when Petitioner's counsel simultaneously represented Petitioner's mother on a facially meritless charge that was expected to be dismissed for lack of factual support. As the state district court found, Diana "testified that she, Bartlett, Ron Sr., and a bondsman met at the jail and Bartlett went through Diana's email to Carrie line-by-line and concluded it wasn't intimidation." (State's Lodging E-1, p. 7.) Bartlett also relied on his experience that the prosecutor's office had never gone back on its word that it would dismiss a

charge. Further, there is insufficient evidence that Bartlett or the prosecutors were involved in any joint deal to dismiss Petitioner's mother's claim only if Petitioner first pleaded guilty. The mere timing of Petitioner's mother's hearing being set by the prosecutor on a date after Petitioner's change-of-plea hearing does *not* show that dismissal of the mother's charge was *conditioned upon* Petitioner's guilty plea.

The Court agrees with the state courts that Petitioner's post-conviction testimony is not credible compared to the more credible testimony he gave at the change-of-plea hearing and the sentencing hearing. At the post-conviction hearing, Petitioner testified that Bartlett told him he had to admit he committed the crime, but Petitioner protested and told Bartlett he did not commit the crime. However, in Petitioner's allocution at sentencing, he clearly stated that he committed the crime:

> I would like to take this opportunity to express my deep sorrow and apologize to Carrie, our children, both of our families for the incredible pain and anguish I have caused through my actions. I know the damage I've done to Carrie is irreparable. I pray that she and her family will be allowed to heal in peace.

> I accept full responsibility for my actions on August 9.

(State's Lodging A-5, p. 96.)

This Court also agrees that Petitioner has pointed to nothing counsel did that harmed Petitioner's case because of the dual representation. Counsel rightly omitted Diana's letter and testimony from his sentencing for a strategic reason that benefitted Petitioner's case, and counsel would have done so regardless of whether he represented

**MEMORANDUM DECISION AND ORDER - 27**

Diana. The content of the letter placed Petitioner's extended family in a bad light, which could have reflected badly on Petitioner. The fact that omission of the letter *also* helped Diana's case does not detract from the fact that the letter likely would have harmed Petitioner's case.

Under *Strickland*, Bartlett was entitled to make strategic decisions about what evidence to present at sentencing. His strategic decisions were based upon years of experience—and actual bad experiences—with mothers providing what they erroneously viewed as "supporting" testimony for their convicted adult children. The record objectively reflects that the content of Petitioner's mother's letter *did* contain some potentially harmful content.

Petitioner also argues that the "conflict of interest" generally prevented his counsel from performing effectively at sentencing. He asserts: "No defensive argument could be made for Petitioner at sentencing because doing so would have prejudiced Diana's interest in having her case dismissed the next day." (*Id*. p. 15.) This allegation is controverted by the sentencing hearing transcript.

The record reflects that Bartlett put on an adequate defensive argument in light of the overwhelming bad facts facing Petitioner. Bartlett asked the Court to not consider past custody issues, but to acknowledge that the family law courts always considered Petitioner fit to have 40% custodial time with the children—a decision that would not have been made if Petitioner had been violent during that time. Bartlett painted a picture

**MEMORANDUM DECISION AND ORDER - 28**

of Petitioner as a compassionate nurse with a 17-year-long career. Bartlett highlighted

Petitioner's record of 48 years without a crime, as well as the particular life stressors

Petitioner was facing that culminated in his decision to go to his ex-wife's house to

threaten her: Petitioner had just ended an affair, Petitioner's current wife was pregnant

and he was unsure whether he wanted another child, Petitioner had just lost his job, and

Petitioner felt that he was being shut out as an "outsider" because his ex-wife and

children were heavily involved with a church that he did not attend and a religious

lifestyle he did not embrace. Bartlett asked for the court to consider placing Petitioner in

a Rider program and permitting him to relocate to Montana and remain far away from his

ex-wife.

 This was a reasonable defense argument in light of the gravity of the crime and

clear evidence that Petitioner planned and carried out the crime. An investigating officer

testified that he analyzed the computer in Petitioner's home and found the following:

> In the Google searches I observed, you know, put into
> Google itself to search for topics "Murdered Wives",
> "Gunshots", "Gunshots to the Head", "Suicide", "Suicide
> Gunshots to the Head", "Rape," some porn was on there,
> some dating sites, like someone attempted to get on a dating
> site, and I also observed research done. It looked like for that
> case Betty Broderick, who ... had gone through a divorce. It
> seemed like she was infatuated with him. Kept harassing him.
> He had since remarried, I think, it was, like, five years
> afterwards, since their divorce. She would make entry into
> their house, but eventually, the bottom line was, she entered
> the house, shot his new wife twice. Once in the head, once in
> the chest and then shot herself—or shot him—excuse me—
> and killed her ex-husband by breaking into their house.

(*Id.*, pp. 32-33.) In addition, Petitioner committed the crime on the wedding anniversary date of Petitioner and the victim, also indicating a plan. (*Id.*, p. 64.)

For all of the foregoing reasons, Petitioner has failed to show that a conflict of interest existed, or, even if it did, that any conflict caused Bartlett to do anything that harmed Petitioner's case, including during plea bargaining and at sentencing. This claim fails under the deferential AEDPA standard, because fair-minded jurists could disagree whether the Idaho Court of Appeals' decision is inconsistent with a prior holding of the United States Supreme Court. It is quite the opposite in this case based on the evidence from the post-conviction remand hearing—few, if any, reasonable jurists would *agree* with his position. Alternatively, this claim fails under the de novo review standard. This claim will be denied and dismissed with prejudice.

## CLAIM 2: COERCED GUILTY PLEA

Claim 2 is that trial counsel was ineffective for pressuring Petitioner to accept the State's plea offer. For the reasons that follow, this claim will be denied.

### 1. Standard of Law

The United States Supreme Court has held that the validity of a guilty plea turns on "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Court held that a plea is not knowing

and voluntary if it was the result of defense counsel's advice amounting to ineffective assistance of counsel. *Id.* at 59.

The United States Supreme Court has noted that "there is no per se rule against encouraging guilty pleas." *Corbitt v. New Jersey*, 439 U.S. 212, 218–19 (1978). However, a voluntary plea must be free from either "physical or psychological coercion." *Henderson v. Morgan*, 426 U.S. 637, 653 (1976). These standards underlie the *Strickland* ineffective assistance of counsel standard set forth above.

## 2.  Idaho Appellate Court Decision

On appeal after remand of the coerced plea claim, the Idaho Court of Appeals addressed the deficient performance aspect of this claim, but declined to address the prejudice aspect because it was not presented in a procedurally proper posture on appeal:

> Eddington contends that the day before the hearing to change his plea to guilty, trial counsel "raise[d] his voice," "yelled" at Eddington, and "was coercing [him] and threatening him with his mother's imprisonment and financial ruin if [he] did not plead guilty." He also contends that he was "shocked," "terrified," and had "no alternative" but to plead guilty. Trial counsel testified to the contrary that he did not recall getting angry with Eddington. The district court also noted the existence of "extensive" recorded conversations between trial counsel and Eddington in which trial counsel explained the importance of Eddington making his own decision about whether to plead guilty.
>
> Based on this evidence, the district court rejected Eddington's assertion that trial counsel "yelled at [Eddington], got angry, told him he had to [plead guilty], and inferred his mother's case would not be dismissed [as] just incredulous" and "simply not credible." Likewise, the district

court also rejected Eddington's testimony at the evidentiary
hearing that he was lying under oath at the sentencing
hearing about the voluntariness of his guilty plea due to
pressure from his trial counsel. These findings are credibility
findings within the district court's province, are supported by
the evidence, and will not be disturbed on appeal.

Finally, Eddington asserts he "would have made a
different decision regarding his plea" if he were "aware of
the multiple contradictory and compassionate [sic]
statements" his ex-wife made to the police. This argument,
however, is not one Eddington alleged in his petition for
relief or argued to the district court. For these reasons, we
decline to address the argument. *See State v. Fodge*, 121
Idaho 192, 195, 824 P.2d 123, 126 (1992) (noting
longstanding rule not to consider arguments raised for first
time on appeal).

Regardless, "the decision to plead guilty before the evidence
is in frequently involves the making of difficulty judgments."
*McMann v. Richardson*, 397 U.S. 759, 769-70 (1970). "That
a guilty plea must be intelligently made is not a requirement
that all advice offered by the defendant's lawyer withstand
retrospective examination in a post-conviction hearing." *Id*.
The district court concluded that trial counsel's advice was
"competent and reasonable" and that Eddington "ultimately
made up his own mind" to plead guilty. We agree; the
evidence supports that Eddington's plea was knowing and
voluntary.

(State's Lodging F-5, pp. 6-7.)

## 3. Analysis

The record reflects that, at the evidentiary hearing, Bartlett convincingly refuted

the claim that he coerced Petitioner to plead guilty to gain dismissal of Petitioner's

mother's case to benefit her or to end the case because he thought Petitioner could not

**MEMORANDUM DECISION AND ORDER - 32**

afford a trial. Telephone calls presented at the hearing supported Petitioner's counsel's testimony. The state district court carefully made findings of fact regarding Petitioner's lack of credibility when placed against the backdrop of testimony from all of the witnesses, the telephone calls, and the plea agreement documents.

Petitioner argues that the Idaho Court of Appeals made an unreasonable finding of fact when it found that the state district court correctly found that the January 14, 2014 phone call between Petitioner and his mother did not contain "discussions ... that their cases were linked." (State's Lodging F-5, p. 5.) Petitioner argues that the state district court wrongly thought the alleged angry discussion between Petitioner and Bartlett occurred on that date, when it really occurred the day after that conversation, the timing of which makes the trial court's factual finding impossible. Petitioner asserts that the phone call between him and his mother shows that Petitioner was "confused and anxious" as to why his mother's case had not yet been dismissed, and that, but for Bartlett's advice to them that they not discuss the cases over the recorded jail phone lines, Petitioner and his mother would have been more explicit about the dismissal and guilty plea connection during their phone calls.

Even assuming that this is an error rather than merely a different perspective of the content of the phone call, the record still strongly supports the remainder of the Idaho Court of Appeals' factfinding. In particular, much more on point is a telephone call between Bartlett and Petitioner demonstrating that —far from demanding that Petitioner

plead guilty against his will—Bartlett took extra care to make sure that the guilty plea was Petitioner's decision. The state district court described it as follows:

> Petitioner and Bartlett discussed the plea offer to which Petitioner says, "Wow, kidnaping, that's bad." Bartlett followed up with, "So, I have your permission to go forward?" and Petitioner responds, "Yeah, I guess." Upon hearing that tentative response, Bartlett actually told Petitioner to think more about whether to plead because Bartlett didn't want the Petitioner to guess. Bartlett tells Petitioner that he thinks pleading out is the right thing to do but that Bartlett wants the Petitioner to have more time to think about it. There was no discussion about Diana's case on any calls recorded to this point. Petitioner did not enter a plea at the status conference on December 12, 2013.

(State's Lodging E-1, p. 257.) In addition, this claim rests on Petitioner's credibility, because Bartlett denied any angry outbursts. The record shows that Bartlett's testimony at the post-conviction hearing was more credible than Petitioner's testimony, both in content and because Petitioner's newer testimony completely contradicted his own prior testimony at the change of plea and sentencing hearings.

There is insufficient corroborating evidence to support Petitioner's story that Bartlett coerced or pressured him to plead guilty. Rather, the record reflects that, consistent with two decades of criminal law experience, Bartlett gave advice, analyzed evidence, predicted a negative outcome at trial, recommended taking the plea, and encouraged Petitioner to take the time to make his own decision on whether to plead guilty or proceed to trial.

**MEMORANDUM DECISION AND ORDER - 34**

The Court concludes that Petitioner has not shown that the Idaho Court of Appeals made an unreasonable finding of fact when it decided that the evidentiary hearing transcript supported the state district court's findings; that Bartlett testified more credibly than Petitioner at the evidentiary hearing; and (b) that Petitioner's plea was knowing and voluntary. Petitioner's reference to a vague conversation between his mother and himself that does not address the particular topic at issue is not convincing. In addition, no other corroborating evidence shows that any coercion or undue pressure entered into Petitioner's decision to plead guilty, especially given his denial of coercion at the change of plea hearing and his admission of guilt at the sentencing hearing. No deficient performance is evident from the record. Petitioner has failed to show that fair-minded jurists could not disagree whether the Idaho Court of Appeals' decision that his counsel did not perform deficiently is inconsistent with *Strickland*. Because an ineffective assistance claim that fails on either *Strickland* prongs fails altogether, Petitioner is not entitled to relief on this claim. The result is the same under de novo review.

### CLAIM 3(A): FAILURE TO INVESTIGATE DISCOVERY MATERIALS

Claim 3(a) is that Bartlett failed to investigate the discovery he obtained in the case; namely, that he failed to listen to the audio recordings of police interviews of Petitioner's ex-wife that contravened her sentencing hearing testimony that Petitioner had been violent throughout their history.

1. **Idaho Appellate Court Decision**

The Idaho Court of Appeals addressed this claim as follows:

> The district court concluded that Eddington "has not met his burden of showing that counsel was ineffective because he failed to listen to the audio recordings [of his ex-wife's] police interviews. The preponderance of the evidence is that [trial counsel] did listen to that audio and was prepared to address it at sentencing." The evidence supports this conclusion, which turns on a credibility issue. Evaluating the credibility of the testimony of Eddington and trial counsel; weighing that testimony; and drawing inferences therefrom are functions solely within the district court's province, and we decline to second-guess such matters.

(State's Lodging F-5, p. 6.)

2. **Analysis**

Here, Petitioner provides no convincing factual or legal argument to show that the

Idaho Court of Appeals' factfinding about Bartlett's credibility and Petitioner's lack of

credibility was erroneous or unreasonable. There were two sets of audio recordings

referenced at the post-conviction hearing—present jail phone calls and past investigative

audios. Bartlett testified that there were about 160 present jail phone calls between Ron

and Diana, Ron and Tracy, and Ron and other people. (State's Lodging E-3, p. 11.)

Bartlett testified: "I listened to all of the audios in the case with the exception of some of

the jail calls. Of course, they just kept rolling out and rolling out and rolling out. But I

listened to all the investigative audios in the case multiple times." (State's Lodging E-2,

p. 245.)

Petitioner testified that Bartlett told him that Petitioner's family, who was paying for the defense, could not afford for trial counsel to listen to all of the audiotapes. It is unclear whether "audiotapes" meant the jail phone calls, the investigative audios, or both. Only the investigatory audiotapes are relevant to the sentencing claim. Regardless, the state court found that Petitioner was not credible, and Bartlett was credible in testifying that he listened to the investigatory audiotapes several times. The record supports such a finding. Therefore, Petitioner has failed to show deficient performance in preparation, and this claim fails on the first prong of *Strickland*. Because reasonable jurists could disagree whether the Idaho Court of Appeals' opinion is inconsistent with *Strickland*, this claim fails under deferential AEDPA review. It also fails under de novo review.

## CLAIM 3(B): FAILURE TO PREPARE FOR SENTENCING

Related to Claim 3(a) is Petitioner's Claim 3(b), that Bartlett failed to prepare adequately for sentencing because of the alleged conflict of interest, specifically that Bartlett failed to cross-examine the victim during the victim impact statement at the sentencing hearing.

### 1.  Idaho Appellate Court Decision

On appeal after remand in the post-conviction matter, the Idaho Court of Appeals assumed that Bartlett performed deficiently based on his own admission,[2] but denied the

---

[2] Bartlett testified at the post-conviction hearing as follows:

**MEMORANDUM DECISION AND ORDER - 37**

claim for failure to show prejudice to the defense. However, Petitioner takes issue with

the following italicized portions of the appellate court's opinion:

> Eddington claims his trial counsel was ineffective for
> failing to object to Eddington's ex-wife's testimony or to
> cross-examine her at his sentencing hearing. Eddington does
> not identify any objections trial counsel should have made or
> any specific cross-examination. Eddington does, however,
> reference the audiotapes of his ex-wife's police interviews and
> his phone calls, emails and texts to her, and he suggests this
> information would have disputed the State's narrative that he
> was "an obsessive, controlling, manipulative, stalking
> individual who was violently abusive."

> Generally, whether to object or to cross-examine a witness
> involves trial counsel's tactical or strategic decisions, which
> this Court will not second-guess on appeal unless the
> decisions are a result of inadequate preparation, ignorance of
> relevant law, or other shortcomings capable of objective
> evaluation. *Gonzales*, 151 Idaho at 172, 254 P.3d at 73. In
> this instance, however, trial counsel expressly acknowledged
> he mistakenly failed to highlight at Eddington's sentencing
> hearing the inconsistency between the testimony of
> Eddington's ex-wife about his abuse and prior information
> indicating Eddington had never been physically abusive.

---

Q.      Now, with regards to your sentencing notes, had you intended to make that [that Carrie never claimed abuse during marriage before] an issue at sentencing?

A.      I had. I intended to make an issue that Carrie had never claimed during the very contentious??? long custody dispute that there was violence between them, had told Dixon in an interview that he hadn't been violent before. There was the discussion about also e-mails, that there weren't threats of violence in those. And I intended to make that point.

Q.      And, what did you discover?

A.      I discovered that I failed to make that point in any kind of clear way, and that was an absolute failure.

(State's Lodging E-2, p. 243.)

**MEMORANDUM DECISION AND ORDER - 38**

Given trial counsel's acknowledgement of the mistake, we assume for purposes of our analysis that trial counsel's representation fell below an objective standard of reasonableness. *See Aragon*, 114 Idaho at 760, 760 P.2d at 1176. Despite this assumption, however, Eddington has failed to establish prejudice. *To establish prejudice, Eddington must show a reasonable probability that, but for his trial counsel's mistake, the outcome of the sentencing would have been different. See Lafler v. Cooper*, 566 U.S. 156, 165 (2012) (explaining prejudice standard extends to sentencing); *see also Richman v. State*, 138 Idaho 190, 194, 59 P.3d 995, 999 (Ct. App. 2002) (requiring evidence [showing that the] court would have ordered different sentence to show deficient performance prejudiced defendant).

*Eddington failed to make this showing*. As the district court noted, trial counsel's failure to mention the lack of prior physical abuse does not overshadow the gravity of Eddington's offense and the related facts, including that he held his ex-wife at gunpoint for over an hour, threatening to kill her; contemplated the crime over a course of time; and, before his crime, reviewed "gruesome photos of head wounds" and conducted Internet searches of "gunshot wounds" and of "murdered wives." Relying on these facts*, the district court concluded Eddington would have received the same sentence*, regardless of the audiotapes of his ex-wife's police interviews. This conclusion is supported by the evidence, and *we agree trial counsel's failure to object to the testimony of Eddington's ex-wife and to cross-examine her did not prejudice Eddingto*n.

(State's Lodging F-5, pp. 8-9 (emphasis added).)

### 2. Analysis

With respect to the *Strickland* prejudice prong, Petitioner argues that the above portion of the state appellate decision applied the wrong standard because the state

**MEMORANDUM DECISION AND ORDER - 39**

district court decision also applied the wrong standard—that is, whether the sentencing court "would have given a different sentence," rather than whether there was a "reasonable probability" of a different outcome. (Dkt. 14, pp. 25-28; see also State's Lodging E-1, pp. 277-278 (state district court's analysis of *Strickland* prejudice prong).)[3] The problematic feature of his argument is that the post-conviction judge and the sentencing judge were one and the same. Petitioner argues, "[e]ven if the evidence did not, in fact, change Judge Norton's mind, there could still have been a reasonable probability that it would have changed her mind." (Dkt. 14, p. 27.)

Under a different set of procedural facts, such an argument would be well-taken, based on the following explanation of *Strickland* given by Justice O'Connor in her concurring opinion in *Williams v. Taylor*:

> Take, for example, our decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we

---

[3] In *Strickland v. Washington*, 466 U.S. 668, 695 (1984), the Court explained:

The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors.... When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

MEMORANDUM DECISION AND ORDER - 40

> held in *Strickland t*hat the prisoner need only demonstrate a
> "reasonable probability that ... the result of the proceeding
> would have been different." *Id*., at 694, 104 S.Ct. 2052.

*Id.* (O'Connor, J., concurring), 529 U.S. at 405–06.

However, in Idaho, post-conviction cases are assigned whenever possible to the same judge who presided over the original criminal case. (*See* State's Lodgings A-5, E-1.) Doing so gives the judge the benefit of having experienced the pretrial and trial proceedings first hand, including having observed the demeanor of the parties and witnesses at trial and sentencing.[4] Therefore, it makes sense in this particular procedural

---

[4] The United States Court of Appeals for the Ninth Circuit and the United States Supreme Court have addressed and approved of the propriety of assigning cases according to this model. For example, in the context of a due process claim in *Murray v. Schriro*, the court explained:

> Roger has not identified any Supreme Court case holding that a defendant is deprived of due process when the trial judge presides over post-conviction proceedings. Rather, the opposite is true. *See id*.; *see also Cook v. Ryan*, 688 F.3d 598, 612 (9th Cir. 2012) (noting that the trial judge was "ideally situated" to make an assessment of the facts when resolving post-conviction issues) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 476, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007) ). The distinction is plain. As a fact witness, the judge would be seeking to persuade the finder of fact to a certain view of the evidence. As the presiding jurist, the judge is the factfinder, with absolutely no incentive to shade the facts one way or the other. *See, e.g.*, Fed. R. Evid. 605 (providing that the presiding judge may not testify as a witness in the trial over which he presides); *see also United States v. Berber–Tinoco*, 510 F.3d 1083, 1091 (9th Cir. 2007) (holding that a trial court judge is not a competent witness to factual matters in a case over which he presides). No similar conundrum exists when the trial judge presides over post-conviction proceedings. In the post-conviction proceedings, the judge functions as a reviewer of the trial proceedings rather than as a chronicler of the facts. As the Supreme Court has explained, the trial judge's unique knowledge of the trial court proceedings renders him "ideally situated" to review the trial court proceedings. *Landrigan*, 550 U.S. at 476, 127 S.Ct. 1933.

*Id*., 882 F.3d 778, 820–21 (9th Cir.), *cert. denied sub nom. Murray v. Ryan*, 139 S. Ct. 414 (2018).

**MEMORANDUM DECISION AND ORDER - 41**

context for the post-conviction judge to use the phrase that the additional evidence "would not have made a difference," because the judge was analyzing her own sentencing decision, as opposed to analyzing another judge's sentencing decision. In contrast, a judge analyzing a different judge's sentencing decision could determine only there there was, or was not, "*a reasonable probability* that it would have made a difference" to the sentencing judge.[5]

At the state appellate court level, however, the jurists making the decision are different from the original factfinding sentencing judge; therefore, they must use the "reasonable probability " standard, as the Idaho Court of Appeals recognized.

As noted above, the Idaho Court of Appeals presumed deficient performance and analyzed the claim on *Strickland*'s prejudice prong. (State's Lodging F-5, pp. 8-9.) The appellate court therefore identified the correct standard of law—not that the outcome of the sentencing would have been different—but, "a reasonable probability that, but for his trial counsel's mistake, the outcome of the sentencing would have been different." (*Id.* at

---

[5] In *Strickland*, the Court explained the reasoning behind the "reasonable probability" standard:

> In determin[ing] whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like.... The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.

466 U.S. at 694–95.

**MEMORANDUM DECISION AND ORDER - 42**

8.) The Idaho Court of Appeals then concluded: "Eddington failed to make this

showing." (*Id*.)

In the same paragraph, the appellate court discussed the lower court's reasoning

and its ruling:

> As the district court noted, trial counsel's failure to mention
> the lack of prior physical abuse does not overshadow the
> gravity of Eddington's offense and the related facts, including
> that he held his ex-wife at gunpoint for over an hour,
> threatening to kill her, contemplated the crime over a course
> of time, and, before his crime, reviewed "gruesome photos of
> head wounds" and conducted Internet searches of "gunshot
> wounds" and of "murdered wives." Relying on these facts,
> the district court concluded Eddington would have received
> the same sentence, regardless of the audiotapes of his ex-
> wife's police interviews.

(*Id*.)

Also in the same paragraph, in analyzing the district court's conclusion, the Idaho

Court of Appeals did *not* conclude that the sentence "would not have been different," but

instead concluded that the deficiencies "did not prejudice Eddington." (*Id*.)

Petitioner asserts that the Idaho Court of Appeals opinion is contrary to the

*Strickland* standard, even though the Idaho Court of Appeals identified the correct

standard of law, concluded that Petitioner failed to make that showing, and concluded

that the deficiencies "did not prejudice" Petitioner.  However, a habeas corpus court is

not "require[d] ... to ignore a state court's explicit explanation of its own decision."

*James v. Ryan,* 733 F.3d at 916. The double deference standard requires Petitioner to

**MEMORANDUM DECISION AND ORDER - 43**

show that no reasonable jurist would disagree with his contention that the Idaho Court of

Appeals did not use the "reasonable probability" standard to review the state district

court's decision. *See id*. Indeed, in the context of and because of the serious nature of the

crime and the gruesome research Petitioner conducted before the crime, Petitioner failed

to show that there was a reasonable probability that, but for his trial counsel's mistake,

the outcome of the sentencing would have been different" had a different reasonable

sentencing judge heard Petitioner's case. (*Id*. at 8.)

Assuming, as the state courts did, that Bartlett rendered deficient performance on

this point, the Court turns to whether that omission prejudiced Petitioner's defense at

sentencing. The Court agrees with the Idaho courts that it did not.

First, Bartlett *did* make the argument that Carrie exaggerated the degree of

violence in her relationship with Petitioner. Bartlett made the important point that the

custody judge would not have continued to give Petitioner 40% custody of their children

if there had been such violence. That point was undisputed. Bartlett certainly could have

bolstered his argument if he had remembered to ask for admission of the police interview

that showed Carrie admitting that violence had not occurred during their long custody

dispute. However, Bartlett still would have had to tread very lightly in that area so as not

to be perceived as attacking the victim.

MEMORANDUM DECISION AND ORDER - 44

Along with his emphasis upon the fact that Petitioner had 40% physical custody of his children, Bartlett made a fairly convincing argument at trial that the prior custody battles were not relevant:

> And it's very easy now with Mr. Eddington sitting here, to say every little bad thing you can possibly imagine about him because, frankly, I'm not in a position, no more inclined to want to be, attack Ms. Eddington about those things, about why they didn't get along, about why there were so many difficulties in the custody issue, and, yet, every little thing, her perception of him, has come in, and I'm troubled by that because this court's supposed to be sentencing for the conduct for which he pled guilty, and I trust the court knows that.
>
> Carrie Eddington and her family are angry, and they're frustrated, and they're mad, and they're scared, and for that reason, they don't have perspective.

(State's Lodging A-5, p. 80.)

At the post-conviction hearing, Bartlett testified about the extreme care with which a defense attorney has to bring forward evidence aimed at the victim's credibility at a sentencing hearing:

> I represent the client, and I don't want to be seen as attacking a victim ... [b]ecause I am in some way the embodiment of the client. If I am attacking a victim, then it is though the defendant is reattacking the victim.
>
>     * * *
>
> Also, it ignores the fact that a crime has been committed and that person is in fact a victim of that crime. And so attacking a person at sentencing I think is almost always going to backfire. In fact, there have been times when I have desperately tried to make a point that came close to attacking. That wasn't the purpose, but one could see it that

MEMORANDUM DECISION AND ORDER - 45

> way, and it has backfired. It's something you have to be very
> careful about because, of course, the system is there for a
> reason. This is a sentencing of your client, not the victim.
>
>         And a bunch of bad information about the victim,
> particularly if it is not related to the offense, is not useful to
> the court and is likely to result in harm to your client.

(State's Lodging E-2, pp. 230-31.)

While perhaps Bartlett could have very gently raised the evidence that showed a

lack of violence and harassing behavior before the crime was committed without directly

attacking Carrie, this Court's review of the entire record leads it to conclude that the

failure to bring forward the police interview, emails, or other minor discrepancies

between what Carrie said before and after the crime would have done little to deflate the

terrifying circumstances of the crime.

At sentencing, Carrie testified as follows:

>         Honorable Judge, the actions of Ron Eddington have
> greatly affected my life. The night that he broke into my
> home and held me at gunpoint for an extended period of time
> was by far the worst night of my life. I have never felt a
> paralyzing fear like I did when I opened my eyes to find my
> ceiling fan on and Ron standing in front of me holding a
> handgun. Immediately my body started shaking so badly that
> I felt soreness in my arms and shoulders for days afterwards.
>
>         I found it difficult to open my mouth to speak or even
> breathe normally. I realized later that I had urinated on my
> bed without knowing it I was so afraid. I was unable to work
> for almost two weeks. Having Ron point a gun at me
> repeatedly, over and over, telling me his plan to shoot me and
> then lay down beside me and kill himself, hearing a clicking
> sound coming from a handgun, seeing his finger on the

**MEMORANDUM DECISION AND ORDER - 46**

> trigger, to even go so far as to describe the type of bullets he
> would use to murder me, is beyond terrifying.

(*Id.*, p. 6.)

Carrie's father recounted that he had received a telephone call from the victim

about 3:52 in the morning:

> She was crying, frantic and hysteric, I guess. It's hard
> to describe. And she immediately told me that Ron had come
> to her house, broken in, pointed a gun at her, threatened to kill
> her and then kill himself, and, told me that, she didn't need to
> worry. It wouldn't hurt, that he had hollow point bullets in the
> gun, and there would be no pain, whatsoever, and he wanted
> to be found laying in bed, his bed, with her, and then, of
> course, I immediately told her that I was on my way to come
> to her.

(*Id.*, p. 16.)

This Court concludes that the Idaho Court of Appeals recognized and applied the

correct federal standard, and this Court is bound to review "the last reasoned decision" by

a state appellate court, not the underlying district court opinion. *See Ylst*, 501 U.S. at 804.

Where the state district court findings and conclusions differ from the state appellate

court, it is the state appellate court's decision that governs and is reviewed by the federal

habeas court. *See James v. Ryan*, 733 F.3d at 916. Because Petitioner has not shown that

fair-minded jurists could not disagree that the Idaho Court of Appeals applied the correct

standard and came to the correct conclusion on the prejudice prong of *Strickland*, he is

not entitled to federal habeas corpus relief. Therefore, this claim will be denied and

dismissed with prejudice.

**MEMORANDUM DECISION AND ORDER - 47**

## ORDER

**IT IS ORDERED:**

1. Respondent's Motion for Extension of Time (Dkt. 16) is GRANTED. The sur-reply brief is deemed timely and has been considered.

2. Petitioner's Motion for Leave to Present New Evidence (Dkt. 19) is DENIED as moot.

3. The Petition for Writ of Habeas Corpus (Dkt. 1) is DENIED and DISMISSED with prejudice.

4. The Court finds that its resolution of this habeas matter is not reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

DATED:  March 31, 2021

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge